BERNARD H. RIDDER and Others, Respondents, *v.* HARRY B. HAINES, Appellant.

First Department, April 29, 1932.

*Joseph M. Proskauer* of counsel [*J. Alvin Van Bergh* and *Arthur Moynihan* with him on the brief; *Arthur Moynihan*, attorney], for the appellant.

*Louis Steckler* of counsel [*Ralph J. Gutman, Terence J. Mullen* and *Myles B. Amend* with him on the brief; *Amend & Amend*, attorneys], for the respondents.

McAvoy, J.   The action is for libels published on two occasions in the *Paterson Evening News*, a newspaper having its issue in Paterson, N. J.   Defendant is the editor of the paper.

The defendant pleaded the truth of the articles in justification.

On July 1, 1929, the plaintiffs acquired a controlling stock interest in the Press-Guardian Printing and Publishing Company, the corporate owner of the daily newspaper known as the *Paterson Press-Guardian*.

Charles D. Whidden was appointed publisher of the *Press-Guardian* by the plaintiffs on their taking control.   He was the representative of the plaintiffs in the management of the business of that newspaper.

On July 1, 1929, a great number of circulated copies of the *Press-Guardian* was sold outright to newsdealers and newsboys, who purchased copies of the paper for distribution.   They sold to the public for three cents at street corners or at news stands, but when delivered to the home of the customer the price was twenty cents per week for six copies.   The wholesale price of the newspaper to the newsdealer was two cents per copy.   His earnings were thus six cents per week on newspapers sold at the news stands and eight cents per week when delivered to the home of the customer.

The additional charge of two cents for the delivery of six copies was paid to the newsboys who delivered the papers for the newsdealers.

On August 2, 1929, the *Press-Guardian* announced in its publication that, effective as of August 5, 1929, the price would be " two cents a copy, twelve cents a week delivered, six days."

The effect of the new rate was to abolish the newsdealers' delivery charge.   The newspaper delivered to the customer at his home was sold at the same price as at the news stand.

The delivery charge which had been turned over to the newsboys who delivered the papers was thus deducted from the price.

Defendant charged that to defeat the newsdealers in the controversy that arose plaintiffs attempted to bribe and corrupt the delivery boys who formerly handled defendant's papers.

Defendant Haines (in articles appearing in the *Evening News* on October 24 and November 5, 1929) characterized plaintiffs with using unfair tactics in order to deprive the newsboys of a livelihood and using trickery and underhanded methods.

The question litigated was whether in the " trade war " the Ridders really resorted to trickery and underhanded methods and whether Haines was justified in saying that the newspaper boys were confident that the Ridders would not " be able to crush them and rob them of their right to remain in business."

There is no dispute about what the Ridders did. They did not call their manager, Whidden, and his assistant, Devlin, was called as a witness by the defense. It seems conceded that these papers were delivered to the households in Paterson by boys employed by various newsdealers. The Ridders recognized that this delivery system was the fountain head of all circulation. When they abolished the delivery charge, they threatened the business prosperity of these dealers, and the dealers, including one Ashworth, protested.

It is said then that the Ridders proceeded to attempt to undermine the dealers by corruption. They sent Devlin to Ashworth.

Devlin said this was his direction as to Ashworth: " I was to go up to his store and tell him that if he did not change his mind by noontime, * * * that we would ' kill ' him, that is, we would cut him off our galley and he would receive no more papers."

This threat did not move Ashworth and Devlin so reported to Whidden. Thereafter he was told to go up and get the names of Ashworth's customers on his routes, and thus he proceeded: He went to the home of Masiello, one of the boys, and through him he got in touch with the rest of the boys. These were boys employed by Ashworth. He got the names from the route books, which were Ashworth's books of customers. He made a list of them and turned them over to Whidden, who put them in a regular circulation book for delivery, and he was then told to offer all these boys a job with Ridder's paper.

Whidden then addressed the boys and told Devlin to give each of the boys a dollar and told them to come back for their evening papers. Devlin gave them appropriate instructions, reported to Whidden and was then again told by Whidden to " kill Ashworth."

This testimony of Devlin's is corroborated in every essential by the witnesses Masiello and Young.

The same day, these boys, whose corruption had thus been attempted by Ridder's agent, went to Ashworth, their employer, with sufficient copies of plaintiffs' paper received from the plaintiffs' agent to supply Ashworth's customers.

Subsequently, Whidden told the newsdealers' committee that " he had gotten in touch with Ridder Brothers and that he was instructed to authorize the newsdealers to charge a delivery charge on the paper." . Thereafter, the *Press-Guardian* published a statement that the newsdealers were authorized to charge three cents delivery charge but that the *Press-Guardian's* own boys would deliver the paper for twelve cents a week. The *Press-Guardian* also scattered throw-away advertisements throughout the city stating: " How do

you like the *Press-Guardian?* Two cents per copy, twelve cents a week delivered by boy, six days. Watch us grow."

So after promising the newsdealers that they might have their delivery charge, the Ridders made their promise wholly nugatory by advertising that they would deliver the paper without a delivery charge.

We think that this fairly subjected the Ridders to the charge made in the articles as to their treatment of the newsdealers, and that the defense of justification was fully sustained. The court erred on the proven facts in finding for plaintiffs.

The judgment should be reversed, with costs, and judgment directed for the defendant dismissing the complaint, with costs.

FINCH, P. J., MARTIN, O'MALLEY and TOWNLEY, JJ., concur.

Judgment reversed, with costs, and judgment directed for the defendant dismissing the complaint, with costs.